**ATTACHMENT B**

00069
```
 1  children in Connecticut are assigned to a managed care
 2  program?
 3       A    Yes, sir, most are.
 4       Q    And the exceptions for that are relatively
 5  rare?
 6       A    It is a smaller volume, yes, I would have to
 7  say that.
 8       Q    Now, referring to the delays in payment from
 9  the managed care organizations, is there any particular
10  managed care organization where that has been an issue?
11       A    There was at the time of this report.
12       Q    And at the time of the report which one was
13  that?
14       A    Dental Benefit Providers.
15       Q    At the bottom of the paragraph that starts at
16  the top of 7, you indicate that the majority of your
17  overdue claims is attributable to one managed care
18  organization?
19       A    Yes, sir.
20       Q    And that would be DBP?
21       A    DBP, Dental Benefits Provider.
22       Q    And you indicate in that paragraph that as of
23  March 31, 2002 my office is owed over $30,000 in
24  Medicaid reimbursement 60 days overdue; is that correct?
25       A    Correct.
```

00070

1    Q    And that was true at the time?

2    A    Yes, sir.

3    Q    And the majority of those outstanding claims

4    were attributable to DBP; is that correct?

5    A    That's correct.

6    Q    Have those outstanding claims been resolved as

7    of today?

8    A    Tremendous improvement, but not without a lot

9    of extenuating efforts on the part of my staff to get

10    something done.

11    Q    And do you know whether or not all of this

12    $30,000 in outstanding claims that you referred to in

13    your report that were 60 days overdue as of March 31,

14    2002, were they all clean claims?  First of all, do you

15    know what the term clean claims means?

16    A    Yes, I do know what the term means.

17    Q    And can you give me your understanding of the

18    term?

19    A    According to my staff and what they sent

20    through our electronic claim system, the answer to that

21    question is yes, they were clean claims.

22    Q    And by a clean claim, do we mean a claim that

23    on paper appears to be properly payable?

24    A    Not only properly payable, sir, but not

25    returned to the office as not clean.

00071
1      Q     So is it the practice that if your office
2   submits a claim --
3                MR. BARBER:   I'm going to go off the
4   record.
5                (Pause.)
6                MR. BARBER:   I'll withdraw that.
7   BY MR. BARBER:
8      Q     Do you know how much is currently due in
9   outstanding claims for reimbursements to managed care
10  organizations, and by outstanding, I mean late more than
11  60 days overdue?
12     A     Greater than 60 days, about 22,000, no 19,000
13  to date, that was as of August 31st.
14     Q     And to what extent was that 19,000, were they
15  all clean claims?
16     A     As far as we were concerned, they were.
17     Q     Earlier on that paragraph you make the
18  statement that approximately 54 percent of the monies
19  due your office as it relates to Medicaid accounts are
20  greater than 90 days past due, you make that statement?
21     A     That statement, "As of March 31st"?
22     Q     "As of March 31st."
23     A     Yes, sir.
24     Q     And it was true at the time?
25     A     Yes, sir.

00072

1    Q    And so this percentage, though, refers only to

2  monies that were due to your office more than 90 days

3  late?

4    A    From Medicaid, Medicaid monies.

5    Q    Can you explain to me what you meant by this

6  statement?

7    A    All right.  Approximately 54 percent of the

8  monies due my office as it relates to Medicaid accounts,

9  total accounts receivable, what is the amount greater

10  than 90 days, and it is just a percentage ratio of that.

11  Not of my whole accounts receivable for the office, just

12  the Medicaid component.

13    Q    So of the Medicaid claims that were

14  outstanding, a percentage, 54 percent were more than 90

15  days overdue?

16    A    Correct.

17    Q    And, again, it's your position that all those

18  claims were clean claims?

19    A    Yes, sir.

20    Q    You then make the point that credentialing is

21  also an administrative problem?

22    A    Yes, sir.

23    Q    That each of the Medicaid programs have their

24  own credentialing?

25    A    Correct.

**ATTACHMENT C**

00111
1   now on, these will be our rules on x-rays."

2       Q    Was that in writing?

3       A    Yes.

4       Q    And do you have a copy of that writing with you

5   this morning?

6       A    I believe it's --

7       Q    Included in the package we'll get to?

8       A    Included in the package.

9       **Q    You also indicate that "Payments are falling**

10  **behind by thousands of dollars again"; is that correct?**

11      **A    Yes.**

12      **Q    And in making this statement in your report, are**

13  **you referring specifically to DBP or not?**

14      **A    Yes.**

15      **Q    And are you referring to any other managed care**

16  **plan?**

17      **A    In that specific case, no.**

18      **Q    And what's the factual basis for your testimony**

19  **that payments by DBP are falling behind by thousands of**

20  **dollars again?**

21      **A    My staff has reported that problem to me.**

22      **Q    And have you brought written documents with you**

23  **this morning supporting that claim?**

24      **A    Yes.**

25                  MR. SIMPSON:  Is it in that binder, the

**Attachment C**

Munk, Peter 9/24/02                    Page 111

00112
1   blue binder?

2                   THE WITNESS:  I'm not sure exactly where

3   those papers were.  I believe they were copied.

4                   MS. GRACE:  I do think so also.

5                   THE WITNESS:  The most recent batch.

6                   MR. SIMPSON:  Did you remember seeing this

7   in the documents?

8                   MS. GRACE:  I thought I did see them in the

9   documents.

10                  MR. SIMPSON:  Because I'm almost sure --

11  here's one to Stacey Smith.

12                  THE WITNESS:  The other one should be with

13  it.

14      Q    (By Mr. Barber)  I think I'm waiting for you to

15  produce the documents in your file that support your

16  statement that payments are falling behind by thousands of

17  dollars again.

18                  MR. SIMPSON:  Let's use these because these

19  are already marked.  Here is your copy.

20                  MS. GRACE:  Those are marked as well.

21                  MR. BARBER:  These are not the same

22  documents he just gave me.

23                  MR. SIMPSON:  Is this not the same letter?

24  Yes, same thing.  Keep the original.

25                  THE WITNESS:  Can you read that?

00113

1      Q     (By Mr. Barber)  Dr. Munk --

2                     MR. BARBER:  Actually, why don't you mark

3      these two pieces of paper Bates stamped MUN 00506 and the

4      second is PMUN 00013 for identification as whatever the

5      next number is.

6                     (Exhibit 4, photocopy of handwritten notes,

7      marked.)

8      Q     (By Mr. Barber)  Dr. Munk, showing you a document

9      marked Defendant's Exhibit 4 for identification, can you

10     identify the document?

11     A     Yes.

12     Q     What is it?

13     A     Page 1 is a fax that I sent to Stacey Smith of

14     Dental Benefit Providers following up on a phone call --

15     conference that we had the day before regarding outstanding

16     claims, that there were 95 claims outstanding for services

17     rendered from the dates of January 1st, '01, to July 1st,

18     '01, informing her that most of these claims had been

19     submitted more than once, and then informing her that if

20     she wanted the details, she could speak to my secretary

21     Joanna, and also informing her that interest would be due

22     as well as compensation to the office for the extra time

23     spent in re-submitting the claims.

24                     And the second page, these are notes --

25                     MR. SIMPSON:  Are both Exhibit 4?

00114

 1          MR. BARBER:  Yes.  Both documents are

 2  marked as 4, yes.

 3      A    These are notes breaking the claims down by

 4  doctor, showing how many claims each doctor had

 5  outstanding, the dates, and how many times each claim had

 6  been submitted.

 7      Q    (By Mr. Barber)  Referring to the first page of

 8  Defendant's 4 for identification, is that dated July 7 of

 9  2002?

10      A    July 17.

11      Q    17th.  And the second page which is Bates stamped

12  PMUN 00013, when was this document prepared?

13      A    On or about 7/17/02.

14      Q    And as I understand your testimony, this relates

15  to claims that were submitted in the first half of 2001; is

16  that correct?

17          MS. GRACE:  Objection to the form of the

18  question.

19      A    As stated on the fax, most of these claims are for

20  July 1st of 2001 -- I'm sorry -- January 1st of 2001 to

21  July 1st of 2001.

22      Q    (By Mr. Barber)  In fact, are there any claims for

23  any period subsequent to the end of June 2001?

24          MR. SIMPSON:  Objection to the form of the

25  question.

00115

1      A    Well, as I stated, to the best of my knowledge,

2    these are all claims that fall between January 1st of 2001

3    and July 1st of 2001.

4      Q    (By Mr. Barber)  All right.  And the reference on

5    the first page of Defendant's 4, the memo to Stacey Smith

6    from Peter Munk dated July 17, 2002, referring to the 95

7    claims outstanding, again, those relate to dates of service

8    between January 1, '01, and July 1, '01; is that correct?

9      A    1/1/01 to 7/1/01.

10     Q    Has this dispute with Dental Benefit Providers

11   concerning unpaid claims attributable to this six-month

12   period in 2001, has that been resolved?

13     A    Partially.

14     Q    And how has it been resolved?

15              MR. SIMPSON:  Objection to the form of the

16   question.  He said it was partially resolved.

17     Q    (By Mr. Barber)  What do you mean by partially?

18     A    Some of the claims have been paid; some have not;

19   and to the best of my knowledge, I have not received

20   interest on the overdue claims or compensation for the

21   extra time put in.

22     Q    And for those claims that have not been resolved,

23   has Dental Benefit Providers, have they maintained that the

24   claims are not properly payable?

25              MS. GRACE:  Objection to the form of the

00116

1    **question.**

2        **A    My understanding is that they are in the process**

3    **of being paid.**

4        **Q    (By Mr. Barber)    In the next paragraph of your**

5    report, you indicate that MCO's do not always agree with

6    the Department of Social Services over who is covered; is

7    that correct?

8        A    Yes.

9        Q    And what's the factual basis for that statement?

10       A    My own personal experience, there have been many

11   cases where the managed care organization claims that on a

12   specific date a specific patient was not covered by that

13   plan, and yet the printout from the electronic verification

14   device in our office proves that according to DSS, the

15   patient was eligible for services that day.

16       Q    And how often does this happen?

17                MR. SIMPSON:  Object to the form of the

18   question.

19       A    As I understand it, almost on a daily basis.

20       Q    (By Mr. Barber)  And the basis for that

21   understanding is what?

22       A    Information from my receptionists, who actually

23   have to do the verification process.

24       Q    Going to the next paragraph, you make the

25   statement that "In 1999, only 16 percent of children had

**ATTACHMENT D**

00059

```
1        the reimbursement for that; it would come back
2        directly from them.
3    Q   Okay.  And your next example is the MCOs'
4        denial of legitimate claims.  What do you mean
5        by that?
6    A   I go on further in this to explain.  Some of
7        the examples are that there are some Medicaid
8        procedures that in the past and continue, as
9        far as we know, to be legitimate claims, such
10       as there's a particular procedure code for an
11       orthodontic screening, which is required for
12       us to refer children to the orthodontist for
13       an orthodontic evaluation.  It is a billable
14       claim and was always paid before and I'm not
15       sure if any of the managed care companies are
16       paying for that.  That is just an example of
17       that.
18   Q   Isn't there an appeals process available for
19       providers when claims are denied?
20   A   We've had meetings with all of the managed
21       care companies, and we've done what we thought
22       we could do.  Again, that's not my job
23       technically.  I do participate in the process,
24       but I don't -- that's not my job, technically,
25       to take care of that.  But, in spite of that,
```

00060
1      many of these things are just not paid.

2  Q    Don't your contracts with the managed care

3      companies set forth a grievance process?

4  A    I don't have firsthand knowledge of that.

5  Q    Okay.  You also indicate the managed care

6      companies' slow payment habits.  How slow do

7      you mean?

8  A    Sometimes for many, many months.

9  Q    And how quickly were you paid under

10     fee-for-service?

11  A   We were paid -- I believe we were paid within

12     several weeks, maybe a month.

13  Q   Have you brought those slow payment habits to

14     the MCOs' attention?

15  A   Yes, we have.

16  Q   What was their response?

17  A   They'll look into it; they'll take care of it.

18  Q   And was it taken care of?

19  A   No.

20  Q   Did you bring the slow payment habits to DSS's

21     attention?

22  A   Yes, we have.

23  Q   And what was their response?

24  A   They told the managed care companies to fix it

25     or to handle it.

00061

1   Q   __Did you bring the denials of legitimate claims__

2       __to DSS's attention?__

3   A   __Yes, we have.__

4   Q   __What was their response?__

5   A   __No direct response.__

6   Q   I believe further on you do give quite

7       specific examples of the administrative and

8       billing staffs, so we'll get to that in a

9       moment, as well as the computers.

10          You also indicate that there's a

11      significant problem for the HPS dental program

12      as far as recruiting and retaining dentists.

13      What specifically do you mean by that?

14  A   It is difficult to recruit and retain dentists

15      at the fees that our budget will allow us to

16      pay for the dentists.  They can command a lot

17      more money elsewhere.

18  Q   And you indicate the program's down to one

19      part-time dentist.  Is that still the case?

20  A   It's not, "down to."  That's not what that

21      says.

22  Q   I'm sorry.  "Down at least one part-time

23      dentist."

24  A   Right.

25  Q   Is that still the case?

00065
```
 1   Q    That's the only reason?

 2   A    With the billing?

 3   Q    Yes.

 4   A    Correct.

 5   Q    That's the only reason?

 6   A    Yes.

 7   Q    You state, on page 8, that the MCOs sometimes

 8        completely ignore claims.  Can you explain

 9        what that means?

10   A    Well, our billing department -- the head of

11        the billing department, Rita, is the one that

12        tracks this and keeps track of the claims, and

13        there are certain claims that get submitted

14        that after months and months and months have

15        not been paid, and so she has a big pile of

16        these claims that have never been paid.

17        That's typically when we set up and deal with

18        that in a meeting with a particular managed

19        care company, and they really have no response

20        to that.  They just -- then they say, "Oh, you

21        know" -- well, they say a number of different

22        things, but sometimes it's like, "We've had a

23        problem with our computers that we didn't

24        really know about.  We're all on track, and it

25        will get taken care of."  So she has to
```

**Attachment D**

00066

1    resubmit claims, and sometimes she has to

2    resubmit those claims two or three times

3    before they get paid.  It's impossible to

4    actually track down and follow up with every

5    single claim, so there are some claims that

6    just never get addressed or paid.

7  Q    They actually never get paid?

8  A    Well, that's what she has told me.

9  Q    Do you personally know that they never get

10    paid?

11  A    No, I don't.

12  Q    You also indicate that they deny claims that

13    are valid.  And, again, are you aware of

14    whether or not the program pursues appeals of

15    such denials?

16        MS. MORELLI-WOLFE:  Objection to the

17    form of the question.

18  A    I believe we pursue whatever avenues that we

19    can.

20  BY MS. FELICIANO:

21  Q    Toward the bottom of the same page, where

22    you're discussing difficulties with refusals

23    to pay for certain procedures or combinations

24    of services, you're talking about Code 0130D

25    on the same --

00067

1    A     Yes.

2    Q     -- day as 9110D?

3    A     Correct.

4    Q     What is "periocoronitis"?

5    A     It's an inflammation of the periodontal tissue

6          that is surrounding an erupting tooth.

7    Q     You then indicate that you've attempted to

8          follow up with Ken Lambert of DSS --

9    A     Yes.

10   Q     -- about the denials of such combinations of

11         codes?

12   A     Yes.

13   Q     And what was the outcome of that?

14   A     We're still not -- we still may or may not be

15         getting paid on any one given submission.  I

16         don't know every single one; but, to my

17         knowledge, we typically don't always get paid

18         for those.

19   Q     But Dr. Lambert told you, you should be?

20   A     Yes.

21   Q     Okay.  Where you indicate that the managed

22         care companies told you it was their policy

23         not to pay for orthodontic screening

24         referrals, did you make DSS aware of that?

25   A     Yes.

00068

1   Q    Did you make Dr. Lambert aware of that?

2   A    Yes.

3   Q    And did he tell you, you should be reimbursed

4        for that?

5   A    He told me that that was a legitimate payable

6        service.

7   Q    And have you been getting paid for that since?

8   A    I know I've -- I don't know all of them.  I

9        know I've been in meetings where we continue

10       to not get paid for them.

11  Q    Are you having these problems with all of the

12       MCOs?

13  A    Yes.

14  Q    Each MCO consistently denies the same

15       combination of procedures?

16  A    Not necessarily the same things at any one

17       time; it may be different MCOs at different

18       times.

19  Q    Is there one MCO that seems to be more

20       specific when you point out that DSS is

21       telling you that something should be

22       reimbursed?

23            MS. MORELLI-WOLFE:  Objection to the

24            form of the question.

25  A    I don't know that.

00069
1    BY MS. FELICIANO:

2    Q    Is there one MCO that's being particularly

3         troublesome as far as paying for these

4         combined codes?

5    A    I don't know that I could tell you one was

6         better or worse than the other.

7    Q    Do you know if you've had to -- you mentioned

8         repeated meetings trying to resolve these

9         recurrent problems.  Do you know if you've met

10        more frequently with one MCO?

11   A    We have probably met more with DBP, simply

12        because they have been around longer.

13   Q    With respect to DBP telling you that children

14        had to be assigned to you --

15             MS. MORELLI-WOLFE:  Can I ask where

16        you're referring to?

17             MS. FELICIANO:  I'm sorry.  Bottom of

18        page 10.

19             MS. MORELLI-WOLFE:  Thank you.

20   BY MS. FELICIANO:

21   Q    -- did you bring that issue to DSS's

22        attention?

23   A    Yes.

24   Q    And was there any response from DSS?

25   A    I recall one particular meeting when we were

Dimmock, Diane 8/21/02                          Page 69

**ATTACHMENT E**

**ATTACHMENT E**

**FILED UNDER SEAL**

**ATTACHMENT F**

**ATTACHMENT F**

**FILED UNDER SEAL**