to children from multiple sources for over the last decade. SJ 1 at RFA Doc. 7d (Children's Health Council, *Evaluation of the Connecticut Access Medicaid Managed Care Program: Impact on Recipient Access to Quality Care,* hereinafter "CHC 1997 Eval" at 70) (April 1997); SJ 1 at RFA Doc. 2b ("External Quality Review Medicaid Managed Care Mystery Shopper Project 2000," at 5-8, presented to the State of Connecticut DSS by Qualidigm) (December 2000); "("External Quality Review Medicaid Managed Care Mystery Shopper Project 2006," page 2, presented to the State of Connecticut DSS by Qualidigm) (October 25, 2006). Parella testimony.

    53. Omitted.

    54. Omitted.

    54. From October 1996 to June 2002, calls to the Children's Health Infoline ("CHIL") of the Children's Health Project from parents who could not obtain dental care for their children enrolled in HUSKY A were consistently one of the top reasons for calls to the CHIL, and in the calendar years 2000-2002, calls concerning dental care were among the top five reasons for calls for all quarters but one. Lee testimony; SJ 40A-T.[3]

    55. As reported by the Executive Director of the Children's Health Council in March 2000, the CHIL receives hundreds of calls [each month] from families needing assistance finding dental care for their children. SJ 41.

G. Participation of Connecticut Dental Providers in the Medicaid Program is Extremely Low

    56. Attracting and retaining dentists to provide services to Medicaid recipients remains

---

[3]Due to the number of reports included in this exhibit, the full citation to each report is not included herein. Citations to the individual reports are included in the exhibit list which precedes the attached exhibits to Plaintiffs' June 19, 2003, Local Rule 56(a)1 statement.

an issue in the Medicaid program. SJ 42 at 26; Parella testimony.

57. Omitted.

58. As of March, 2000, approximately 250 dentists were providing the vast majority of care for over 300,000 Medicaid recipients statewide (including HUSKY A and Medicaid fee-for service recipients.) SJ 1 at RFA #15; Parella testimony.

59. As of March 2003, the Connecticut Medicaid program had approximately one hundred dental practices which handled a significant amount of Medicaid work. Parella testimony.

60. There are very few dental in the northeastern part of the state. Parrella testimony; SJ 43.

61. Omitted.

62. As reported by DSS actuarial consultant, Lewin-VHI, in 1995, there were not enough participating Medicaid dentists system-wide to support the expected enrollment levels in the HUSKY A program. SJ 1 at RFA Doc. 3a at 1-2. Parella testimony.

63. In 1997, the Children's Health Council reported to DSS that there were dentists in Connecticut who were: not accepting additional Medicaid patients, no longer accepting Medicaid, no longer participating in certain HUSKY plans, only taking patients within certain age limits, or scheduling Medicaid patient appointments only during certain hours. SJ 1 at RFA Doc. 7d ("CHC 1997 Eval" at 71); Parella testimony; Balaski testimony.

64. In 2000, DSS' external quality review organization, Qualidigm, conducted a "mystery shopper survey" to determine whether providers were accepting HUSKY A patients, the results of which were included in DSS' 2002 waiver renewal application to CMS. The survey reported that most dentists called in the provider database were no longer accepting new

11

Medicaid patients, and only 49% of attempts actually resulted in a dental appointment being scheduled. **SJ 1** at RFA Doc. 2b ("External Quality Review Medicaid Managed Care Mystery Shopper Project 2000," at 5-8, presented to the State of Connecticut DSS by Qualidigm) (December 2000); Parella testimony; Balaski testimony.

65. A 2006 "mystery shopper survey" conducted by Qualidigm found access to dental care to be deficient across all health plans and provider groups. Joint Trial Memorandum Exhibit 1, page 2, ("External Quality Review Medicaid Managed Care Mystery Shopper Project 2006," page 2, presented to the State of Connecticut DSS by Qualidigm) (October 25, 2006). The report noted concerns regarding appointment availability of concern as only 26.20 percent of calls resulted in scheduled appointments. *Id.* The report found MCOS provided inaccurate and out-of-date information to callers, and found that follow up calls resulted in contradictory information in approximately 40% of the time. *Id;* Parella testimony; Balaski testimony.

66. Omitted

67. In 1996, Stanton Wolfe, D.D.S, M.P.H., the Oral Health Director for the State of Connecticut Department of Public Health ("DPH"), developed and administered a DPH survey of Connecticut dentists, and found that 40% of dentists who participated in the HUSKY A plan at the time intended to resign. **SJ 44** at 20; Wolfe testimony.

68. Omitted

69. Omitted

70. Omitted.

71. In 2000, Dr. Stanton Wolfe reported that less than ten percent of Connecticut dentists at that time; *i.e.,* less than 300 of the state's approximately 3000 licensed dentists, were active Medicaid providers that billed over $10,000.00 per year in Medicaid claims, in his report. "Oral

Health in Perspective," SJ 1 at RFA # 14.; Wolfe testimony.

72. There are an inadequate number and distribution of dental providers to take care of the needs of underserved populations in Connecticut. Wolfe testimony.

73. Omitted.

74. The large majority of registered Medicaid dental providers aggregate within the larger cities along the southwestern coast of Connecticut and through the central corridor of the State from New Haven to Hartford, leaving large regions of the state without dental Medicaid providers. SJ 47 at 6; Testimony Balaski, Edelstein.

75. In 2003, there were only 13 dental safety nets that provide HUSKY A services, *i.e.*, non-profit hospital clinics, community health clinics, federally qualified health clinics ("FQHC"), school-based health centers and local public health department clinics. The large majority of these "safety nets" are situated within larger cities along the southwestern coast of Connecticut and through the central corridor of the State from New Haven to Hartford, leaving large regions of the state without safety nets. Balaski, Nardello testimony; SJ 47 at 7.

76. According to a 1999 Center on Research and Public Policy survey commissioned by the Connecticut State Dental Association to assess dentists'' awareness of and participation in the Connecticut Medicaid program, only about 40% of dentists surveyed were participating in the defendant's Medicaid program at varying levels. SJ Exh B (The Center on Research and Public Policy, "Connecticut Medicaid Study," prepared for the Connecticut State Dental Association) (January 1999); Parrella testimony.

77. As stated in the 2001 "Elements" report commissioned by the Connecticut Health Foundation, the state's five largest metropolitan areas (which include eight of the 169 towns in Connecticut) contain 54% of (at least 90,000) Medicaid-eligible children, but only 18%

13

(approximately 480) of the state's population of dentists. Of these dentists, an estimated 120-145 dentists are specialists other than pediatric dentists and thus do not provide primary dental care services. Crall testimony; Edelstein testimony; SJ Exh. A ("Elements" at 6).

78. As stated in the 2001 "Elements" report, 82% of practicing dentists in Connecticut practice in the 161 towns outside the urban areas where the remaining 46% of HUSKY A beneficiaries reside. Crall testimony; Edelstein testimony; SJ Exh A ("Elements" at 23);

79. Geo-mapping conducted in 2002 from data provided by the defendant and the Connecticut DPH illustrates that the majority of towns outside the primary population corridor extending from Bridgeport through New Haven/East Haven/West Haven, Waterbury, New Britain, and Hartford/East Hartford do not have any Medicaid dental care providers. Also 52% of continuously enrolled HUSKY A recipients under age 19 reside in the eight towns specified above, while 48% reside in the remaining 161 towns. Edelstein testimony; SJ Exh. G.

80. As determined in a survey by the Maternal and Child Health Bureau's National Oral Health Policy Center at Columbia University, in 2002, in the 52 Connecticut towns in which private pediatric dentists are located, only 12 towns currently have one or more pediatric dentists accepting new HUSKY patients, while new non-HUSKY patients have access to new-patient appointments in all 52 towns. Edelstein testimony.

81. Anthony Iton, M.D., JD, is the Director of the City of Stamford's Department of Public Health. According to a 2002 oral health needs assessment and survey conducted under his direction, of the 41of the 81 eligible dental providers who responded to the survey, 7 dental providers currently were accepting HUSKY/Medicaid in Stamford. Iton testimony.

82. Connecticut has dentist-to-population and dental hygienist-to-population ratios that are 36% and 57% higher than the U.S. average, respectively. Edelstein testimony; SJ Exh. A

14

("Elements" at 3).

83. Omitted

84. Omitted

86. DSS' Purchase of Services contracts with the MCOs allow DSS to "suspend" or "freeze" additional enrollment of new members in an MCO in a county of Connecticut if the MCO exceeds the ratio of 484 HUSKY A members per one dental provider in that particular county. Parella testimony; Balaski testimony; Stipulated Fact #28 in July 23, 2007 Joint Trial Memorandum.

87. If a dental provider is enrolled in more than one MCO HUSKY A plan, the defendant allows for the provider to be counted as a provider in each MCO plan for purposes of determining MCO enrollment capacity in a particular county. Silver testimony; Stipulated Fact #29 in July 23, 2007 Joint Trial Memorandum.

88. The primary means of ensuring that dental care is available for Medicaid child recipients throughout the state is a determination of caps on enrollment for each MCO. Parella testimony; Balaski testimony; Stipulated Fact #30 in July 23, 2007 Joint Trial Memorandum.

89. Purchase of Services contracts with the MCOs do not include sanctions, other than enrollment freezes, for MCO non-performance regarding dental access. Parrella testimony; Stipulated Fact #20 in July 31, 2007 Joint Trial Memorandum.

90. Since 1995 each of the MCOs currently contracting with DSS for HUSKY A program services, with the exception of First Choice, has, on more than one occasion, violated the contract performance standard that requires each MCO to maintain dental provider networks in each county in Connecticut at a ratio of at least one general dentist for every 486 enrolled plan members by exceeding that ratio. SJ 1 at RFA #22; Parella testimony; Balaski testimony.

91. Since 1995, enrollment freezes imposed on the MCOs by DSS for failure to meet the contractually mandated 1:484 dental provider to plan enrollee ratio include, designated by county, MCO and date of the enrollment freeze: Hartford county - BCFP (11/29/99); Windham county - HNNE (5/1/99, 5/1/00), BCFP (5/1/02); New London county - CHNCT (5/1/99), HNNE (5/1/00); Tolland county - CHNCT (8/1/97, 7/1/98, 2/1/99), HNNE (5/1/00) BCFP (1999); Litchfield county - CHNCT (8/1/97); Fairfield county - HNNE (11/1/01); New Haven county - BCFP (7/22/02). SJ 50 at response #4; SJ 51; HNCT (9/9/05) Litchfield & Tolland Counties; BCFP (5/1/06) Hartford, Litchfield, Tolland Counties. Parella testimony; Balaski testimony.

92. DSS has never maintained a system for monitoring or assessing, on an ongoing basis, the accuracy of the dental provider lists provided by the MCOs to HUSKY A members, and whether the listed dental providers are accepting new HUSKY A patients. Parrella testimony.

H. Dental Providers limit their participation in HUSKY A to less than full participation

93. The dental providers participating in the defendant's program are not able to provide care to all of the HUSKY A recipients seeking their care and some have had to shut down their practices periodically to HUSKY A clients. Edelstein testimony; Greiner testimony; Munk testimony; Nardello testimony; Goodman testimony; Kohn testimony; Ureles testimony; Pelletier testimony; Googel testimony; Wolkoff testimony; Knowles testimony; Dimmock testimony; Patel; Gaen, Caoutte, Williams, Copeland, Cushing, Imes, Ledesmas, Hagget, Green testimony.

94. Under each of its DSS' HUSKY A managed care waivers, DSS has been required to demonstrate that the HUSKY A program is cost-effective, *i.e.*, the costs incurred under the HUSKY A program, including the capitation payments to the MCOs, cannot exceed the actuarial

estimate of costs that would have been incurred under the traditional fee-for-service program plus cost trend adjustments. Ryan testimony; SJ 1 at RFA Doc. 7e ("Cost Effectiveness Submission" at heading "Description of the Cost-Effectiveness Calculation Process") (2002).

95. Omitted.

96. The MCO capitation payments which vary slightly between MCOs, were and are negotiated by DSS and the MCOs in conjunction with the State Office of Policy and Management. Ryan testimony; Stipulated Fact #20 in July 32, 2007 Joint Trial Memorandum.

97. Initially, the negotiated capitation payments were based on recommended capitation rates derived by DSS' actuaries, Lewin-VHI. DSS later negotiated as a percentage increase over the previous rates without revised recommended capitation rates from DSS' actuarial consultants. The dental portion of the capitation payment is not negotiated separately from the overall capitation payment by DSS and the MCOs. Ryan testimony.

98. No MCO contracting with DSS for HUSKY A services in Connecticut from 1995 to date, has met, or been sanctioned for failing to meet, the annual 80% utilization contract performance measures for dental services for children. Stipulated Fact #33 in July 32, 2007 Joint Trial Memorandum.

99. In commercial insurance plans, typically dental costs are typically segregated from other types of insurance programs to determine premium rates and the rates for each type of insurance program are separately quantified. Hoyer testimony.

100. Unlike the provision of medical care by primary care physicians, the bulk of non-diagnostic services provided by dentists are generally "surgical" rather than "medical" in nature, involving "hands-on" interventions that require special facilities, equipment, and materials. Dentists are akin to surgeons, their offices are akin to small hospitals, and dental operatories are

akin to operating rooms. Edelstein testimony; SJ Exh A; ("Elements" at Appendix: Primer on Oral Health Policy at 6); SJ 77 at Tab A.

101. DSS also based the initial capitation rates paid to the MCOs under the Purchase of Services Contracts on the July 1992 - June 1993 year of fee-for-service Medicaid claims utilization experience, trended forward, *i.e.*, on what DSS paid per member per month for all Medicaid services in this period prior to the transition to managed care. Hoyer testimony; SJ 1 at RFA #31.

102. According to DSS' 1991-1994 HCFA 416s, the percentages of all children enrolled in Medicaid who utilized preventive dental services in the state's Medicaid program (prior to the establishment of the 1995 HUSKY A managed care program) were as follows: 25.8 (1991); 26.6 (1992); 27.2 (1993); 28.2 (1994). Parella testimony; SJ 1 at RFA Doc. 9 (HCFA 416s for federal fiscal years 1991-2001).

103. At the time that the initial Medicaid managed care capitation rates were being developed by DSS, and in subsequent rate-setting calculations in 1996-1998, historical fee-for service participation/utilization data for dental services was not adjusted from participation/utilization levels existing in 1995-1998, approximately 25-30%, to anticipate increasing participation or utilization to the HCFA goal of 80% or to commercial utilization rates, or to any significantly greater level. Hoyer testimony; SJ 1 at RFA Doc. 7b ("Cap Rate 1995"); SJ 1 at RFA Doc. 7b ("Cap Rate 1996"); SJ 1 at RFA Doc. 7b ("Cap Rate 1997"); SJ 1 at RFA Doc. 7d, 7e ("Cap Rate 1998").

104. Omitted.

105. The DSS pediatric dental fee schedule has not been modified since 1993. Complaint ¶65; Answer ¶65; SJ 52; Parella testimony.