106. The DSS 1993 pediatric dental fee schedule was not adjusted to attempt to increase provider participation or the level of participation of existing providers in order to meet the HCFA participation or utilization goal of 80%, commercial utilization rates, or any significantly greater level than the then existing participation or utilization level (approximately 25%). Hoyer testimony.

107. It is an accepted actuarial standard to update dental fee schedules to the applicable year by increasing each service component (procedure code) by appropriate inflation rates or an increase in the National Dental Consumer Price Index. Hoyer testimony.

108. The National Dental Services Consumer Price Index is the measure of the increase in costs of dental services provision, including production costs and demand for services. The annual percentage change in such index for each year, 1993-2000, was 4.8, 4.9, 4.7, 4.7, 4.2, 4.6 (estimated), 4.6 (estimated). Crall testimony; Edelstein testimony; Exh A ("Elements" at Appendix: Financing Dental Care at 8).

109. DSS does not index payments or use another system to keep fees current. Parrella testimony.

110. Since 1995, DSS has not adjusted the dental fee schedules for children and adults to account for increases to the Dental Services Consumer Price Index which has increased cumulatively since 1989 and 1993 by 75.0% and 50.0%, respectively. Hoyer testimony.

111. Omitted

112. In 1995 approximately $7.00 PMPM of the initial capitation payments of $165.66 PMPM were attributable to dental costs. SJ 53, Testimony Parella, Crall.

113. In 2001, approximately $7.00 PMPM of the per member per month of the MCO capitation payments from DSS was allocated to dental costs. SJ 54.

19

114. In 1997, the Children's Health Council reported that reliance on the amount spent in the fee for service Medicaid program perpetuates the access problem that existed in fee-for-service program. 1997 Children's Health Council assessment of the defendant's HUSKY A waiver. SJ 1 at RFA Doc. 7b ("CHC 1997 Eval" at 73); Lee testimony.

115. According to a report of the Health Resources Services Administration, an agency within HHS, the amount in the managed care organization's capitation rate targeted to dental services is usually based on actuarial assumptions that the use of dental services will be the same in managed care as it was under the state-administered fee-for-service program. This assumption will not be correct when the use of dental services was low due to limited access under the State-administered fee-for-service program, and where the managed care plan improves access and the use of dental services. Edelstein testimony; Exh F; SJ 55.

116. The dental service component of the HUSKY A program, has been marginally funded in fee for service and does not provide an adequate funding base for access expansion under managed care. Parella testimony; J 36 at 2.

117. According to Mr. Parrella, HUSKY A dental services costs per member per month, "should probably be closer to ... $12, 13 or $14." Parrella testimony.

118. Actuarial studies by two firms, Pricewaterhouse Coopers (on behalf of the Milbank Memorial Fund) and Towers-Perrin (on behalf of the American Academy of Pediatrics, hereinafter "AAP") conclude that to provide comprehensive oral health care for children on Medicaid and the State Children's Health Insurance Program would require spending approximately $17.00 PMPM and $22.50 PMPM, respectively. Edelstein testimony; SJ Exh A ("Elements" at "Appendix: Financing Dental Care" at 2); Crall testimony; SJ Exh. F (American Academy of Pediatrics, *An Analysis of the Costs to Provide Health Care Coverage to the*

*Children and Adolescent Population Aged 0-21,* conducted by Towers-Perrin, hereinafter "AAP report") (1998); SJ Exh. G (Edelstein BL, Crall JJ., *Pediatric Dental Care in CHIP and Medicaid -- Paying for What Kids Need, Getting Value for State Payments: a Guide for State Policy Makers*, hereinafter "Milbank", Milbank Mem Fund, New York, NY) (1999); SJ Exh. H (Crall JJ. *Children's oral health services: organization and financing considerations,* Ambulatory Pediatrics 2002;2(Suppl.):148-153); SJ Exh. I (Eklund S, Clark S., <u>Healthy Kids Dental Demonstration Program: Assessment of the First 12 Months</u>, hereinafter "Healthy Kids," Ann Arbor, MI: University of Michigan School of Public Health) (April, 2002); Hunt testimony.

119. In April 2001, Dr. James Crall, D.D.S., Sc.D. recommended to then DSS Oral Health Manager Martha Okafor a statewide DSS HUSKY A dental services payment of $16.56 PMPM, and in high-cost areas, a payment of $17.20 PMPM. Crall testimony; SJ Exh E. (Memorandum from James Crall to Martha Okafor, DSS, "Rationale for Recommended PMPM rates for CT Medicaid") (April 25, 2001); SJ 56.

120. In 2007, Connecticut spent approximately $64.60 per employee per month on dental care for state employees. Parrella testimony.

121. Omitted.

<u>(i)  DSS Ultimate Responsibility</u>

122. DSS retains the ultimate statutory responsibility for pediatric dental services rendered and the funds expended when DSS subcontracts or delegates work to non-DSS agencies. Parella testimony, Starkowski testimony, SJ 42 at 31.

(ii) <u>MCO Subcontracting arrangements - specifications, subcontractor spending on dental services, etc.</u>

123. All of the providers in the BeneCare (CHNCT and First Choice/Preferred One)

HUSKY A network are paid on a fee-for service basis. The majority of providers in the Doral (HNCT) HUSKY A network and the DBP (BCFP) HUSKY A dental network are paid on a fee-for-service basis, while a limited number of providers in the Doral and DBP HUSKY A networks are paid on a capitated basis. Parella testimony, Balaski testimony.

124. Omitted.

125. Omitted.

126. DSS contractually requires each MCO to ensure that at least 80% of continuously enrolled plan members two (2) to twenty (20) years of age and at least 80% of continuously enrolled plan members twenty one (21) years of age and older receive at least one dental screening and at least one dental cleaning per twelve month period. Parella testimony; SJ 1 at RFA #s 20, 21.

127. No MCO that has ever contracted with DSS for HUSKY A services in Connecticut, at any time since 1995 to date, has ever met, or ever been sanctioned for failure to meet, the annual 80% utilization contract performance measures for dental services for children or for adults. Parrella testimony; SJ 1 at RFA #s 23, 24.

128. MCOs and their dental subcontractors expect to achieve dental services utilization of approximately 30-40%, and the MCOs do not target an 80% dental services utilization goal in negotiating capitation rates with the at-risk subcontractors or in projecting their own dental costs under arrangements with not-at-risk subcontractors. Parella testimony.

129. HNNE, BCFP and First Choice and/or their subcontractors would lose money or exceed their cost projections if utilization of HUSKY A dental services were to exceed 40-50%. . Parella testimony.

130. HNNE's cost projections, and BCFP's capitation payments to its dental

22

subcontractor, would have to double in order for utilization under their plans to reach 80%.  .  Parella testimony.

131. Since 1995, the MCOs and their subcontractors have reimbursed HUSKY A dental providers paid on a fee-for-service basis who do not have negotiated fee schedules, *i.e.*, the majority of HUSKY A dental providers, at: a) the state's 1989 adult and 1993 children's dental fee schedules within rounding to the nearest dollar; or b)120% and 100% of the state's 1989 adult and 1993 children's dental fee schedules, respectively for providers enrolled in CHNCT prior to its contract with BeneCare; or c) at 120% and 110% of the state's 1989 adult and 1993 children's dental fee schedules, respectively, for providers currently enrolled in the BeneCare (CHNCT and First Choice) networks.   Dimmock testimony; SJ 24 at Attachment A; SJ 66 at 1; SJ 67; SJ 68; SJ 69.

132. The MCOs or their subcontractors negotiate higher payments on a non-advertised basis with a limited number of specific providers or dental practice groups when there is a special need for service in a specific area or to keep a HUSKY A provider from dropping out of the MCO's or subcontractor's network. Edelstein testimony.

133. The MCOs, through their dental subcontractors, spend $5 or $6 PMPM, or approximately 4.0% of their total HUSKY A expenditures, on dental services for HUSKY A recipients. Parrella testimony; SJ 70; SJ 71 at Figure 13; SJ 72 at "Utilization Cost Summary Report - State Totals."

134. DSS has never directed at least two of the MCOs to spend a specific dollar amount or a specific percentage of the capitation payment from DSS on dental services or to increase their dental fee schedules. Parrella testimony, SJ 73 at ¶ 9.

135. The MCOs and their subcontractors have informed DSS and others that funding of

the dental portion of the HUSKY A program is insufficient. Dimmock testimony; SJ 64 at 2; SJ 74 at cover memorandum; SJ 75.

I. Disparity between Medicaid rates and commercial rates

136. The fees paid by Medicaid are well below commercial rates. Parella testimony, Balaski testimony. SJ 76.

137. As used in relation to dental fees, a "percentile" characterization reveals the percentage of dental care providers who would regard any particular fee for a specified service as equal to or greater than their own typical fee. Crall testimony; SJ 77.

138. DSS stated in March 2000 that its fees were less than the 40th percentile for children. Complaint ¶ 70, Answer ¶ 70; SJ 35; Parella, Balaski testimony.

139. Omitted.

140. Omitted.

141. DSS has acknowledged that without some sort of annualized indexing of the Medicaid dental fee schedule, the ability to attract and retain new providers is quickly lost. Parrella testimony.

142. DSS' current Medicaid dental fee schedule contributes to an insufficient number of dentists to meet the needs of children in the Medicaid program. Parrella testimony.

143. DSS receives many calls from dental providers whose primary concern is that the dental fee schedules are inadequate to support the infrastructure of their operations. Parrella testimony.

144. In 2002, a DSS commissioned report compared the MCO fee schedules to commercial charge levels for dental services in the state. The weighted average (which accounts

for the total number and type of procedures performed) of the payments to HUSKY providers under the HUSKY A MCO fee schedules, $15.79, is 28% of the 25th percentile, 24% of the 50th percentile and 21% of the 75th percentile of Connecticut dentists' commercial charges. Parrella testimony; SJ 78 at Attachment 1.

145. Omitted.

146. DSS' efforts to increase dental access without fee increases only marginally" improved access and have not had a great impact on access to dental services. Parrella testimony.

147. Omitted.

148. In response to DSS requests, Dr. James Crall provided to DSS comparisons of Connecticut Medicaid reimbursement rates for commonly performed procedures to fees paid by commercial insurers and to dentists' charges in September 1998, October 2000 and April 2001. All of these comparisons showed that levels of reimbursement for those procedures under Connecticut's Medicaid dental program were significantly less than dentists" charges and levels of commercial reimbursement, i.e., most of the rates fall below the 10th percentile of fees charged by general dentists in New England. Crall testimony; SJ Exh C (Memorandum from James Crall, D.D.S., Sc.D. to David Parrella) (September 8, 1998) SJ Exh D (Electronic mail from James Crall, D.D.S. Sc.D to Martha Okafor, DSS ) (October 24, 2000) SJ Exh E; SJ 56; SJ 98; SJ 99.

149. A 1999 Connecticut State Dental Association survey found that among all dentists surveyed, including Medicaid participating and non-participating dentists, 81.9% reported low reimbursement levels as a "great barrier" to participation. Low fees was the primary reason given for likely withdrawal from the program. Among the dentists that said they were somewhat

25

likely or not at all likely to begin participating if asked, 33.9% would participate if reimbursement levels were increased.  Parella testimony.

150. As stated in the 2001 "Elements" report, sponsored here by its authors as expert witnesses, in general, the CT Medicaid rates for children's services "fall below, and frequently well below, the 10th percentile of fees charged by general dentists in the New England region. CT Medicaid rates average only 60 percent of the commercial PPO (managed care) rates for the Hartford area, which generally approximate the 50th percentile of fees for the New England region."  Edelstein testimony, SJ Exh A ("Elements" at 5 and Appendix: Financing Dental Care at 4); Aff. 3 (Brown) at ¶¶ 51-55.

151. According to the 2001 "Elements" report, "[a] comparison of Connecticut Medicaid reimbursement rates for adult dental services" analogous to those used in the aforementioned comparison for children "demonstrates that adult Medicaid payments are substantially less and represent an even lower fraction of market-based fees charged by dentists."  Edelstein testimony; Exh A "Elements" at 5 and Appendix: Financing Dental Care at 6).

152. Omitted.

153. Omitted.

154. Omitted.

155. Omitted.

156. Omitted.

157. Omitted.

158. The projected level of participation of dentists in a Medicaid dental program correlates to the levels of reimbursement under the program.  Edelstein testimony; Crall testimony; Brown testimony; Santerre testimony; Hoyer testimony; Exh A ("Elements" at 4-7,

10).

159. As reported in the "Elements" report and by Drs. Crall and Edelstein, Michigan, Alabama, South Carolina, and Georgia "pegged reimbursement rates in their state-administered Medicaid programs to levels designed to achieve true market based purchasing power for upwards of 75% of dentists in their respective states (*i.e.,* the 75th percentile of prevailing fees.). Alternatively, Delaware has implemented a system that pays dentists 85% of submitted charges for Medicaid services.... Each of these initiatives has produced significant increases in the number of services provided, the number of children utilizing services and the number of dentists participating in Medicaid programs." Edelstein testimony, Exh A ("Elements" at 10, 20-21 and "Appendix: Examples of State Efforts at 6-7); Crall testimony; Exh. I ("Healthy Kids).

160. Based on 2001 data provided by MetLife, a large Connecticut commercial dental insurer, the fees paid to the participating dentists by the HUSKY A MCOs and their dental subcontractors fall considerably below a) the 20th percentile of MetLife's dentists' charges in the state of Connecticut for those same procedures that are provided to the general population, and b) are generally less than the 10th percentile when compared to regional data. Crall testimony.

161. Comparing the Medicaid dental fee schedules with commercial schedules indicates an aggregate difference in excess of 75.0 percent. Hoyer testimony.

162. In 1998, the AAP published an actuarial study that projected utilization rates for children enrolled in State Child Health Insurance Programs ("SCHIP") to utilization levels comparable to those of the general population, with utilization adjustments for pent-up demand. Crall testimony; SJ Exh F ("AAP report" at "Approach and Methodology," "Dental Cost Estimates"); Hunt testimony.

163. Pent-up demand refers to the additional utilization of services that typically occurs

27