UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARY CARR, *et al.*,<br>Individually and on behalf of all<br>other persons similarly situated, | : | |
| | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| Plaintiffs, | : | 3:00 CV 1050 (AVC) |
| | : | |
| v. | : | |
| | : | |
| PATRICIA WILSON-COKER, in her | : | |
| official capacity as Commissioner | : | (CLASS ACTION) |
| of the State of Connecticut Department of | : | |
| Social Services, | : | |
| | : | |
| Defendant. | : | May 1, 2008 |

**MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT AGREEMENT
AND CLASS ACTION NOTICE, AND TO SCHEDULE A HEARING
REGARDING SETTLEMENT APPROVAL**

## I.  Introduction

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the parties to the

above-noted action jointly move the Court to issue an order granting the following:  (1)

preliminary approval of their negotiated Settlement Agreement, attached as Exhibit "A"

to their accompanying motion; (2) approval of their jointly proposed class action

settlement notice, attached as Exhibit "B" to their accompanying motion; (3) approval of

the methods of distribution of the proposed class action settlement notice to plaintiff class

and subclass members, as jointly proposed by the parties; and (4) scheduling a date and

time for a fairness hearing regarding final approval of the parties' proposed settlement.

In support of their motion, the parties jointly submit that they have agreed to a

final resolution, following extensive arms' length negotiations, of all outstanding claims

pleaded against the defendant. The parties believe that resolution of this matter through

negotiation, rather than through continued lengthy and expensive adversarial litigation, is

in the best interests of plaintiff class and subclass members, and of the defendant. The

parties further submit that the proposed settlement of this action incorporates terms and

conditions that are fair, reasonable, and adequate, pursuant to Fed. R. Civ. P. 23(e)(2).

Finally, it is the parties' joint belief that the proposed form and distribution of notice to

plaintiff class and subclass members of the proposed settlement and final fairness hearing

are each reasonable, pursuant to Fed. R. Civ. P. 23(e)(1).

## II. Factual and Legal Background

Plaintiffs commenced this class action, individually and on behalf of all other

persons similarly situated,[1] on June 8, 2000, against defendant Patricia Wilson-Coker, in

her official capacity as Commissioner of the State of Connecticut Department of Social

Services ("DSS").[2]    Plaintiffs filed this action for declaratory and injunctive relief to

challenge, pursuant to 42 U.S.C. § 1983, the claimed failure of the defendant to comply

with federal statutes and regulations allegedly mandating the provision of reasonable and

adequate access to oral health care furnished by dental providers to the child and adult

recipients of the Connecticut "HUSKY A" Medicaid managed care program. Plaintiffs

contended that defendant's actions and inaction had resulted in an escalating health care

crisis for low-income child and adult Medicaid recipients who were increasingly unable

---

[1] The named plaintiffs are:  Mary Carr, on behalf of her minor grandson I.N. Brown;
Theresa Hall, on behalf of herself and her minor children, Breanna Smith and Lyndsay
Hall; and Karen Poulin, on behalf of her minor children, R.P. and D.J. Poulin.
[2] Defendant Michael Starkowski is substituted for former Commissioner Wilson-Coker,
in his official capacity as the current Commissioner of DSS.

to reasonably access adequate oral health care from dental providers who were willing to voluntarily participate in the Medicaid program.

The parties' settlement addresses the crux of plaintiffs' action - the alleged failure of the defendant DSS Commissioner to mandate and implement, through oral health care services administered under contract with managed care organizations ("MCO"), Medicaid reimbursement rates at levels sufficient to ensure the participation of an adequate number of Connecticut dental providers in the Medicaid program, which would in turn allow child and adult Medicaid HUSKY A recipients to have reasonable and adequate access to dental care. In their complaint, plaintiffs alleged causes of action based upon federal Medicaid statutes enacted as Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.,* and implementing federal regulations promulgated by the Health Care Financing Administration,[3] U.S. Department of Health and Human Services, 42 C.F.R. pts. 431, 440, 441, and 447. These claims are fully resolved by the parties' settlement.

### A. Plaintiffs' Claims

In their complaint, plaintiffs sought a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and Fed. R. Civ. P. 57, declaring that the defendant's actions and failures to act violated federal Medicaid statutes and regulations, as follows:

(1) By failing to provide payments at a level adequate to attract a sufficient number of dental providers so that Connecticut Medicaid recipients would receive the same access to dental care enjoyed by the general population, as required by 42 U.S.C. § 1396a(a)(30(A) and 42 C.F.R. § 447.204 (First Cause of Action);

---

[3] This federal agency was succeeded by the Centers for Medicare and Medicaid Services ("CMS"), U.S. Department of Health and Human Services.

(2) By failing to adopt and maintain programs and policies which would operate to make dental care available for Medicaid recipients throughout Connecticut, in violation of 42 U.S.C. § 1396a(a)(1) and 42 C.F.R. § 431.50(b)(1) (Second Cause of Action);

(3) By providing dental reimbursement rates and procedures for payment that were so unreasonable that dental care was unavailable or obtainable only after great delay and harm to the health of Connecticut Medicaid recipients, and only after their quality of dental health care was undermined, in violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204 (Third Cause of Action);

(4) By maintaining inadequate dental provider reimbursement rates and claims processing requirements that resulted in the failure to:  properly and efficiently operate the Medicaid dental program; provide necessary dental care with reasonable promptness to recipients; and to ensure that dental care was provided in a manner consistent with simplicity of administration and the best interests of the recipients, in violation of, respectively, 42 U.S.C. §§ 1396a(a)(4), (8), and (19) (Fourth Cause of Action);

(5) By failing to ensure adequate participation by Connecticut dental providers in the Medicaid program, resulting in some Medicaid recipients in the state being able to obtain sufficient dental care while others could not, in violation of 42 U.S.C. § 1396a(a)(10)(B) and 42 C.F.R. § 440.230 (Fifth Cause of Action);

(6) By failing to adhere to the requirement that claims of participating dental providers must be paid promptly and efficiently, resulting in denials of open and timely dental access for Connecticut Medicaid recipients, in violation of 42 U.S.C. § 1396a(a)(37) (Sixth Cause of Action);

(7) By failing to implement the requirement that Medicaid recipients under age 21 be effectively informed of the availability of dental services, including the benefits of preventive dental health care, under the Early and Periodic, Screening, Diagnostic and Treatment ("EPSDT") program, in violation of 42 U.S.C. § 1396a(a)(43) and 42 C.F.R. § 441.56(a) (Seventh Cause of Action);

(8) By failing to provide or arrange for the provision of periodic dental screens to assess dental health, diagnostic dental services, and treatment identified during the dental screens, to Medicaid recipients under age 21 under the EPSDT program, in violation of 42 U.S.C. §§ 1396a(a)(43)(B) and 1396d(r)(1)(A), and 42 C.F.R. §§ 441.56(b)(1)(vi) and 441.56(c) (Eighth Cause of Action);

(9) By failing to provide case management services, transportation, and appointment scheduling assistance to enable Medicaid recipients under age 21 to obtain dental services required by the EPSDT program, in violation of 42 U.S.C. §§ 1396a(a)(43) and 1396d(a)(19), and 42 C.F.R. § 441.62 (Ninth Cause of Action).

In their complaint, plaintiffs sought injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, requiring the defendant to ensure the immediate and adequate availability of necessary dental services to Connecticut Medicaid recipients, as provided by locally accessible dental providers. Specifically, plaintiffs sought to enjoin defendant to take measures to: increase dental reimbursement rates as necessary to recruit an adequate network of geographically distributed, qualified dental providers; effectively inform children under age 21 of EPSDT dental services and the benefits of preventive dental care; provide EPSDT dental screening, and diagnostic and treatment services to children under age 21; provide services to enable children under age 21 to access EPSDT

dental services; and bring the statewide Medicaid dental program into compliance with applicable federal law.

### B. Plaintiff Class and Subclass Certification

In an Order entered March 30, 2001, the Court, per Judge Thompson, certified a plaintiff class pursuant to Fed. R. Civ. P. 23(a) and (b)(2), as follows:

> all individuals in Connecticut who are or will be eligible for Medicaid managed care Husky A benefits and are or will be seeking dental health services.

The Court further certified a plaintiff subclass consisting of:

> all children in Connecticut who are now or will be under the age of 21, are or will be seeking dental health services, and are or will be eligible for Medicaid managed care Husky A benefits.

Carr v. Wilson-Coker, 203 F.R.D. 66, 76 (D. Conn. 2001).

### C. Discovery and Use of Expert Witnesses

Throughout the course of this litigation, plaintiffs engaged in extensive discovery to ascertain the operational details of the provision of HUSKY A Medicaid dental care services by both DSS and contracting managed care organizations. This involved multiple sets of detailed interrogatories, requests for production, and requests for admissions. Plaintiffs' discovery further included the taking of a significant number of depositions, with accompanying document subpoena requests, of staff of Medicaid MCOs; staff of Medicaid MCO subcontracting entities; third party factual witnesses; Marc Ryan, former Secretary, State of Connecticut Office of Policy and Management; Dr. Stanton Wolfe, State of Connecticut Department of Public Health; and DSS agency staff and officials, including David Parrella, Director, Medical Care Administration, Ken

Lambert, Martha Okafor, Jim Linnane, Hilary Silver, and DSS/MCO liaison staff persons.

Plaintiffs retained and disclosed, pursuant to Fed. R. Civ. P. 26(a)(2)(A), 28 expert witnesses to testify at trial regarding critical aspects of the DSS and managed care organizational administration of the HUSKY A dental program which allegedly have caused oral health care access barriers for Medicaid recipients, as well as remedial measures that could correct these programmatic deficiencies in compliance with federal Medicaid law. These experts represented a range of disciplines. Dr. Burton Edelstein, D.D.S., M.P.H., and Dr. James Crall, D.D.S., Sc.D., are nationally-recognized researchers and dental practitioners who were prepared to testify to the impact of rate reimbursement structures and related systems on fostering incentives for dental provider involvement in the Medicaid program. Dr. Peter Milgrom, D.D.S., is a nationally-recognized expert on client and provider outreach systems and their impact on increased access to Medicaid dental services. Dr. Jackson Brown, D.D.S., Ph.D., and Dr. Rexford Santerre, Ph.D., are health care economists familiar with the use of financial incentives to increase Medicaid provider participation as a function of market theory. Robert Hoyer, FSA, MAAA, and Sandra Hunt, M.P.A., are actuarial experts able to testify to the correlation of managed care accounting systems and practices to the effectiveness of Medicaid dental service delivery. Plaintiffs also retained a wide range of dental provider experts, who could testify to the effects of DSS policies on the actual delivery of dental services to Medicaid recipients in Connecticut, in settings including federally qualified health centers, school-based clinics, Head Start programs, hospital clinics, and private dental practices. These individuals included: Dianne Dimmock, R.D.H., MS.Ed.; Robert

G. Door; Shelly Farrar, R.N.; Linda Ferraro, R.D.H.; Dr. Gloria Gertzmann, Ph.D.,

D.M.D.; Dr. Sydney Glassman, D.M.D., A.B.O., F.I.C.D.; Dr. Michael S. Goodman,

D.D.S.; Dr. Fredric R. Googel, D.M.D.; Dr. Donald Greiner, D.D.S., Ms.C.; Mary Ellen

Hass, M.S.W., L.C.S.W.; Dr. Anthony Iton, M.D., J.D., M.P.H.; Robin Knowles, R.D.H.,

M.P.H.; Dr. Donald W. Kohn, D.D.S.; D. Jean Lewis, R.D.H., M.P.H.; Linda Miklos,

R.D., M.P.H.; Dr. Peter Munk, D.D.S.; Vickie Orsini Nardello; Dr. Bertrand Pelletier,

D.D.S.; Robin Sharp; Dr. Gwendolyn Holder Testa, D.D.S.; Dr. Steven Ureles, D.D.S.;

and Joyce Weber, R.N.

Defendant deposed each of plaintiffs' retained trial experts except Dr. Iton and

Ms. Nardello, and plaintiffs' counsel defended each deposition. These depositions took

place in San Francisco, California; New York, New York; Chicago, Illinois; Seattle,

Washington; and in Hartford. Additionally, the defendant deposed each of the named

plaintiffs.

Defendants disclosed David Parrella, Director, DSS Medical Care Administration,

as their retained trial expert, pursuant to Fed. R. Civ. P. 26(a)(2)(A). Plaintiffs deposed

Mr. Parrella.

### D. Partial Summary Judgment Rulings

Plaintiffs moved for partial summary judgment on their Medicaid statutory "equal

access" and EPSDT claims, on June 19, 2003. Defendant moved for summary judgment

on August 8, 2003. Plaintiffs and defendant opposed each other's respective motions.

On January 31, 2006, the Court denied the plaintiffs' motion for partial summary

judgment, finding that genuine issues of fact existed regarding plaintiffs' claims under

Cause of Action VIII of the Complaint regarding the defendant's alleged EPSDT

violations resulting from failing to ensure that children receive needed dental treatment. In its January 19, 2006 ruling, the Court granted defendant's motion with respect to Causes of Action I-VI of the Complaint, finding no private right of enforcement under 42 U.S.C. § 1983. The Court denied the defendant's motion regarding Causes of Action VII and VIII, which alleged violations of the EPSDT statutes, and found that 42 U.S.C. § 1396a(a)(43) creates enforceable rights in program recipients under 42 U.S.C. § 1983. The Court granted in part and denied in part defendant's motion concerning Cause of Action IX. On February 14, 2006, plaintiffs moved for reconsideration of the Court's denial of their motion for partial summary judgment, with respect to the EPSDT claims in Cause of Action VIII of the Complaint. Defendant opposed the motion. In its April 24, 2006 ruling, the Court granted plaintiffs' motion, in that it concluded an error of law had been made regarding timeliness requirements of the EPSDT provisions of 42 U.S.C. § 1396d(r)(3), but reaffirmed its prior decision denying plaintiffs' motion for partial summary judgment, due to the presence of genuine issues of material fact.

### E. History of Negotiations

Arm's length negotiations commenced in early 2006 and subsequently took place over a period of approximately two years, eventually culminating in the Settlement Agreement the parties are jointly proposing to the Court for approval. Plaintiffs utilized the consultation and research of their retained experts Crall and Edelstein to draft and evaluate settlement proposals during these negotiations. The defendant also solicited expert assistance in crafting and evaluating the settlement. The parties explored in negotiations a range of approaches that could be employed to improve Medicaid dental access, chiefly through significant increases in dental provider reimbursement rates for

both child and adult dental services, and a "carve-out" of dental services from the statewide Medicaid HUSKY A managed care network.

During 2007, settlement negotiations between the parties also included the active participation of Office of Policy and Management Secretary Robert L. Genuario and members of his staff, in addition to that of the DSS Commissioner and his staff. The presence of these agency officials and staff expressly incorporated state budgetary issues as part of the negotiations.

In 2006, the Connecticut legislature appropriated, and the Governor signed, an appropriation of $20 million dollars for purposes of settlement of the Carr litigation and for improvement of children's dental care in Connecticut. Public Act No. 06-188 § 24. In 2007, the legislature enacted, and the Governor signed, a biennial appropriation of $20 million dollars to raise Medicaid dental provider reimbursement rates.

Additionally, pursuant to this Court's June 21, 2007 order granting the parties' joint motion for referral of this matter to a Magistrate Judge for settlement purposes, Magistrate Judge Thomas P. Smith presided over three mediation sessions, on August 29, October 25, and November 16, 2007. Magistrate Judge Smith's involvement actively moved this matter towards settlement, especially regarding the issue of plaintiffs' attorney's fees.

**F. Settlement Agreement**

The Settlement Agreement extensively negotiated by the parties affords in significant measure the relief sought on behalf of the plaintiff class and subclass, and is wholly consistent with the merits of the legal claims and range of potential resolutions that could have followed full litigation.

DSS will implement a number of significant, affirmative measures incorporated in the Settlement Agreement, upon approval by the Court. These include, in pertinent part:

(1) The defendant agrees, effective July 1, 2008, to "carve" dental services out of Medicaid managed care, and to administer coverage of the dental services benefits directly, with the assistance of a single contracted administrative services organization ("ASO") which will perform administrative functions connected with the program. The ASO will not be "at risk." DSS will be directly responsible for administering the Medicaid dental services benefit, including reimbursing participating providers for providing covered dental services to class and subclass members.

(2) Effective July 1, 2008, DSS will directly reimburse participating providers for providing covered Medicaid dental services, at levels at least equal to the fee schedule for child subclass members, attached as Exhibit "A" to the Settlement Agreement. These fees represent significant increases for dental reimbursement rates over those in previous use for approximately twenty years. Dental services for adults will be reimbursed at 52% of the fee levels for children.

(3) The defendant agrees that DSS will expend, beginning in the state fiscal year that first commences after the Court's approval of the Settlement Agreement, at least $20 million dollars per year in additional expenditures over base year amounts, for the coverage of dental services to plaintiff subclass children, during the term of the Settlement Agreement.

(4) DSS will engage in an aggressive program of provider recruitment, in cooperation with various entities, designed to encourage dentists, dental hygienists, and clinics and hospitals providing dental services to become Medicaid program providers.

(5) DSS will modify the written eligibility notice currently provided to HUSKY A families, to incorporate information regarding the availability and importance of EPSDT dental services, including recommended child periodicity schedules for preventive and diagnostic screening dental services, as well as the coverage options for necessary treatment. The notice will specify how HUSKY A families can identify participating providers, and how they can obtain appointment scheduling and transportation assistance, and case management services.

(6) DSS or its ASO will electronically monitor the receipt of dental services by child subclass members through provider reimbursement claims, and will issue automatic reminder notices to families if EPSDT dental services are not received within the recommended periodicity schedule.

(7) DSS, acting through the ASO, will provide dental appointment scheduling assistance and medical transportation to requesting HUSKY A families for eligible child subclass members seeking dental treatment.

(8) DSS, acting through its ASO, will ensure that HUSKY A families requesting the scheduling of a dental appointment for child subclass members will actually receive an appointment with a participating provider. The scheduling of

the appointments will adhere to specified timelines and geographic distances, for cooperating families.

(9) DSS will propose a regulation making the failure of the agency to assist a requesting HUSKY family in obtaining a dental appointment for a child, or to provide medical transportation to a dental appointment for a child, a "denial" of assistance that is appealable through the state administrative fair hearing process.

(10) DSS will cover EPSDT dental case management as a covered service for HUSKY A children, under prescribed conditions.

(11) DSS will re-establish its Dental Policy Advisory Committee to provide recommendations regarding measures to eliminate dental access barriers, and the development of HUSKY A recipient dental outreach and educational materials.

(12) DSS agrees to expend $5 million dollars in the current fiscal year on specified program grants to safety net providers, the Connecticut State Dental Association, and for provider outreach, which are designed to promote dental access, prior to the implementation of the increased Medicaid reimbursement rates.

(13) DSS agrees to provide detailed, periodic sets of reporting to plaintiffs for monitoring purposes, designed to assess performance of specified dental access benchmarks.

(14) The defendant agrees to pay the total sum of $300,000.00 to plaintiffs' counsel, representing $190,000.00 in attorney's fees and $110,000.00 in costs.

DSS has already assisted in the provision of state bond and private demutualization grant funds to enable the opening of new federally qualified health center dental clinic space, and to replace or install over 100 dental chairs and related equipment.

The term of the Settlement Agreement is four years, following Court approval.  It is binding upon the parties.  The Settlement Agreement conclusively resolves, for its term, all the parties' claims that were asserted, or which could have been asserted, with respect to claims or defenses regarding the subject matter of the litigation.  It establishes an enforcement process for claims of substantial noncompliance with its terms.  The parties agree that the Court shall retain jurisdiction, for enforcement purposes, regarding specified provisions of the Settlement Agreement.

### G. Connecticut General Assembly Approval of the Settlement Agreement

Conn. Gen. Stat. § 3-125a prohibits the Attorney General from entering into any agreement resolving litigation which requires an expenditure from the General Fund in an amount exceeding two million five hundred thousand dollars, unless the Connecticut General Assembly accepts the terms of the agreement. Accordingly, the Connecticut Attorney General, Richard Blumenthal, submitted the Settlement Agreement to the Connecticut General Assembly on March 7, 2008, pursuant to Conn. Gen. Stat. § 3-125a and Connecticut General Assembly Joint Rules § 32.  Representative Amann submitted a

House of Representatives resolution to the Joint Committee on Appropriations,

supporting approval of the Settlement Agreement. *See* House Resolution No. 8, LCO

No. 3329 (February Session 2008), *available at*

http://www.cga.ct.gov/2008/TOB/H/2008HR-00008-R00-HB.htm . Senator Williams

introduced a comparable Senate Resolution. *See* Senate Resolution No. 10, LCO No.

3327 (February Session 2008), *available at* http://www.cga.ct.gov/2008/TOB/S/2008SR-

00010-R00-SB.htm . On March 31, 2008, the Appropriations, Human Services, Public

Health, and Judiciary Committees, which constituted the committees of cognizance, held

a joint public hearing to review the Settlement Agreement. The Appropriations

Committee voted unanimously that day in favor of approval of the agreement. *See*

http://www.cga.ct.gov/2008/TOB/S/2008SR-00010-R01-SB.htm (Appropriations

Favorable Resolution); http://www.cga.ct.gov/2008/TS/S/2008SR-00010-R00APP-

CV85-TS.htm (Appropriations vote tally sheet);

http://www.cga.ct.gov/2008/BA/2008SR-00010-R000607-BA.htm (bill analysis from

Office of Fiscal Analysis); http://www.cga.ct.gov/2008/FC/2008SR-00010-R000607-

FC.htm (File No. 607); http://www.cga.ct.gov/2008/FN/2008SR-00010-R000607-

FN.htm (fiscal note).[4]

---

[4] There are corollary documents for House Resolution No. 8. *See*
http://www.cga.ct.gov/2008/TOB/H/2008HR-00008-R02-HB.htm (Appropriations
Favorable Resolution); http://www.cga.ct.gov/2008/TS/H/2008HR-00008-R00APP-
CV84-TS.htm (Appropriations vote tally sheet);
http://www.cga.ct.gov/2008/BA/2008HR-00008-R000612-BA.htm (bill analysis from
Office of Fiscal Analysis); http://www.cga.ct.gov/2008/FC/2008HR-00008-R000612-
FC.htm (File No. 612); http://www.cga.ct.gov/2008/FN/2008HR-00008-R000612-
FN.htm (fiscal note).

No further vote or other action was held within 30 days of the submission of the Settlement Agreement to the legislature. The General Assembly is accordingly deemed to have approved the Settlement Agreement, pursuant to Conn. Gen. Stat. § 3-125a(a).

## II. Legal Standards

Class litigation such as the instant action lends itself to settlement because of difficulties of proof, uncertainty of outcome and length of litigation. Bourlas v. Davis Law Associates, 237 F.R.D. 345, 355 (E.D.N.Y. 2006). There is a strong judicial policy favoring settlements, particularly in a complex class litigation context. Wal-Mart Stores, Inc. v. VISA U.S.A., 396 F.3d 96, 116 (2d Cir.), *cert. denied sub nom.* Leonardo's Pizza By the Slice, Inc. v. Wal-Mart Stores, Inc., 544 U.S. 1044 (2005); In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. 306, 310 (E.D.N.Y. 2006); Bourlas, 237 F.R.D. at 354. There is a range of reasonableness in settlements which recognizes the uncertainties of law and fact and the risks and costs inherent in litigation. Wal-Mart Stores, Inc., 396 F.3d at 119. The possibility that the class may achieve more at trial is not dispositive, so long as the result of settlement is within the range of reasonableness. In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 316. Where settlement of a class action results from arm's length negotiations between experienced counsel after significant discovery, the court may presume the settlement is fair, adequate and reasonable. Wal-Mart Stores, Inc., 396 F.3d at 116; In re Initial Public Offering Securities Litigation, 226 F.R.D. 186, 190 (S.D.N.Y. 2005).

The parties must seek this Court's approval of the proposed class action settlement. Fed. R. Civ. P. 23(e). The Court's approval of a class settlement "that would bind class members" must be preceded by a hearing and a finding that the settlement is

"fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court must further "direct

notice in a reasonable manner to all class members who would be bound" by the

proposed settlement. Fed. R. Civ. P. 23(e)(1).

This approval process necessarily implicates several steps. The parties first ask

that the Court preliminarily approve the fairness of the settlement, prior to notice issuing

to the plaintiff class and subclass members. *See* In re NASDAQ Market-Makers Antitrust

Litigation, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). A grant of preliminary approval involves

a determination that "the proposed settlement appears to be the product of serious,

informed, non-collusive negotiations, has no obvious deficiencies, does not improperly

grant preferential treatment to class representative or segments of the class and falls

within the reasonable range of approval...." Bourlas, 237 F.R.D. at 355 (quoting In re

NASDAQ Market-Makers Antitrust Litigation, 176 F.R.D. at 102) (citing In re Initial

Public Offering  Securities Litigation, 226 F.R.D. at 191) (further citation omitted). At

this stage, the Court need only find that the proposed settlement fits within the range of

possible approvable outcomes. In re Prudential Securities Inc. Limited Partnerships

Litigation, 163 F.R.D. 200, 210 (S.D.N.Y. 1995).

Once preliminary approval of the settlement is granted, the parties submit that this

Court should order appropriate notice, in a reasonable manner, to all plaintiff class and

subclass members who will be bound by the proposed settlement. This notice should

reference the terms of the proposed settlement and the date of the final fairness hearing

before the Court. *See* Bourlas, 237 F.R.D. at 355 (citing In re Initial Public Offering

Securities Litigation, 226 F.R.D. at 191)); In re Luxottica Group S.P.A. Securities

Litigation, 233 F.R.D. at 309. The notice must fairly apprise class members of the terms

of the proposed settlement and their options in connection with the proceedings. Wal-Mart Stores, Inc., 396 F.3d at 113.

Finally, the Court conducts the fairness hearing required by Fed. R. Civ. P. 23(e)(2) to provide plaintiff class and subclass members an opportunity to present their views of the proposed settlement and argument and evidence regarding the terms, before making a final determination as to whether the agreement of the parties is "fair, reasonable and adequate." *Id.*

In the review of a class action settlement agreement for fairness, reasonableness and adequacy, courts in the Second Circuit look to the so-called Grinnell factors. Wal-Mart Stores, Inc., 396 F.3d at 117 (citing City of Detroit v. Grinnell Corp., 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds*, Goldberger v. Integrated Resources, Inc., 209 F.3d 43 (2d Cir. 2000)). The six factors relevant to the present case, which does not seek damages but rather systemic declaratory and injunctive relief, [5] include the following:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of maintaining the class action through the trial; and

(6) the ability of the defendants to withstand a greater judgment.

---

[5] Three factors additionally discussed by the Grinnell court concern the role of damages as part of the class action settlement, and are thus not pertinent to the instant case. These factors are: "the risks of establishing damages "; "the range of reasonableness of the settlement fund in light of the best possible recovery"; and "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation." Grinnell, 495 F.2d at 463 (citations omitted).

Grinnell, 495 F.2d at 463.

### III. The Parties Request that the Court Grant Preliminary Approval of the Settlement Agreement.

The Settlement Agreement before this Court is the product of serious, well-researched, non-collusive negotiations over the course of approximately two years, assisted and informed by consultation with national level experts. This was preceded by extensive litigation of the parties' claims and defenses. The Settlement Agreement comprehensively addresses the dental care access problems faced by child and adult recipients of HUSKY A Medicaid benefits, raised in the litigation. It provides no preferential treatment to the named class representatives or to any other segment of the class or subclass. Further, it falls within the reasonable range of potential approvable resolutions that could follow full litigation of such claims. For these reasons, it should be preliminarily approved.

A review of the Grinnell factors relevant to this litigation, with the exception of the factor regarding reaction of the class to the settlement, can be evaluated in advance of the full fairness hearing to be conducted by this Court. The Settlement Agreement is a fully informed document, crafted at arm's length. It will provide a working, detailed outline for improvements to the systemic operations regarding Medicaid dental access over the course of four years following approval by this Court. The pertinent factors, as they apply to this Court's review of the Settlement Agreement, are as follows:

### 1. The complexity, expense and likely duration of the litigation

This case is complex both factually and legally. Trial would require presentation of extensive evidence regarding DSS policy and practice, through oversight of the

operations of the managed care organizations, and as further implemented and administered by those entities. Trial would further incorporate lengthy presentations of evidence of the pattern and practice of dental access barriers experienced by the plaintiff class and subclass, on at least six levels: (1) individual cases of plaintiff attempting to secure dental care through systems implemented through DSS and managed care organizations, who experience restrictions on their ability to reasonably, adequately, and timely access that care; (2) statistical evidence regarding the levels of preventive and restorative dental health care services, including EPSDT diagnostic and treatment services for children under age 21 who request them, that are delivered in timely fashion, on regional and statewide geographic bases, to the Medicaid HUSKY A population, juxtaposed with evidence of those individuals not receiving those services; (3) evidence regarding the specific institutional protocols of the state agency and the business structures of the individual managed care organizations which combine to produce the dental access barriers experienced by the plaintiffs; (4) evidence provided by dental providers, including private dentists, school-based clinics, federally qualified health centers, Head Start programs, hospitals, and others, regarding their inability, due to inadequate rate reimbursement levels and the practices of DSS and managed care, to reasonably provide dental care to HUSKY A recipients; (5) evidence regarding the efforts of DSS and the managed care organizations to implement effective EPSDT outreach, scheduling assistance, transportation, case management, and related services designed to foster Medicaid dental access; and (6) expert evidence demonstrating the systemic economic and related barriers, chiefly including inadequate rate structures, to the provision of adequate dental care to Medicaid recipients in Connecticut.

As the sole state agency administering the Medicaid program in compliance with federal law, DSS operates through twelve offices in three regions, staffed by over a thousand employees who process eligibility for its various benefit programs for plaintiff class and subclass members, including Medicaid. Through a waiver obtained from the federal government, the agency has contracted with four MCOs to provide Medicaid services to recipients, including dental care.[6] Recipients have had to enroll in an MCO to receive HUSKY A health care services, including dental care. DSS has exercised contractual oversight authority over these organizations regarding the adequacy of their dental provider networks. The MCOs in turn have subcontracted with business entities to provide the direct delivery of dental care services to Medicaid recipients, through health care providers that participate in the managed care networks. As of March 2008, there were approximately 225,446 children and 88,446 adults eligible for Medicaid benefits and services in Connecticut.

The parties have completed extensive discovery. Prior to trial, motions in limine would be anticipated to seek the exclusion of the testimony of various retained trial expert witnesses. Other motions in limine would be likely regarding the scope of evidence to be presented at trial, with respect to plaintiffs' pleaded causes of action. These motions would, of course, entail accompanying briefing and hearings.

The expense and delay of trial of this matter would be substantial. The parties estimate a trial on the merits would take approximately two weeks and would likely

---

[6] The Medicaid system in Connecticut is currently in transition. At least two MCOs are administering Medicaid benefits to recipients in the non-capitated, contractual capacity of administrative service organizations on behalf of DSS. Other recipients are currently receiving Medicaid benefits directly from DSS. DSS currently plans to pair delivery of Medicaid benefits by the MCOs with the "Charter Oak Health Plan." See Public Act No. 07-2, § 23 (June Special Session 2007).

involve testimony of at least twenty experts. Their testimony would naturally entail significant expense. Trial testimony would also come from a number of plaintiff class members, regarding the dental access barriers they've experienced. These individuals are all low-income, and their participation in the trial would involve significant hardship. Many class members are impaired by disability, homelessness, and other conditions. Others hold down jobs that provide vital income. The process of preparing for and attending court hearings would be daunting for these individuals. In addition to evidence presented through managed care witnesses, the trial would also involve testimony of many DSS staff and officials, as well as officials from other state agencies. Time spent by DSS employees and administrators preparing for and attending court hearings would be time not spent assisting needy individuals. Additionally, there is extensive documentation that would be submitted as evidence. Pretrial matters and preparation and conduct of the trial would involve hundreds of hours of attorney time and great expense to both parties. In assessing liability and potentially devising relief for the class, the Court would likely have to immerse itself in the details of DSS and managed care operations, and become familiar with current standards of practice regarding effective delivery of Medicaid dental care services.

### 2. The stage of the proceedings and the amount of discovery completed

This factor is relevant to the ability of the Court and parties to assess the strength of the case and the relative efficacy of the Settlement Agreement. Wal-Mart Stores, Inc., 396 F.3d at 118; In re Luxottica Group S.P.A. Securities Litigation, 233 F.R.D. at 312.

The present case was filed in June 2000. Plaintiffs have conducted extensive discovery, now complete, and have retained and disclosed a large number of trial experts. Additionally, the defendant disclosed one trial expert.

In addition to the efforts of counsel for the parties in crafting the Settlement Agreement before the Court, the Connecticut General Assembly is statutorily required to approve this Settlement Agreement. *See* Conn. Gen. Stat. § 3-125a. The General Assembly concluded its legislatively mandated process and approved the settlement.

### 3. The risks of establishing liability and maintaining the class action through trial

As a result of the extensive discovery in this case, as well as the research and investigative efforts of retained expert witnesses, the parties have become well-versed in the range of approaches comparable agencies around the country have taken to identify and afford reasonable access to dental services for Medicaid recipients. To some extent, this was and remains uncharted territory. Many states are struggling to implement improvements in the delivery of Medicaid dental services that take account of the need to make provider participation financially viable, in order to create and maintain adequate provider networks that patients can reasonably access. Indeed, the U.S. Congress has recently conducted hearings on this issue. It is unclear how the courts will ultimately interpret the federally-mandated responsibilities of agencies such as DSS to ensure adequate access to dental care. The range of remedial measures that could be ordered by this Court could create an uncertain, but potentially

extraordinarily expensive level of required investment by DSS to achieve compliance with federal Medicaid law.

A trial, as well as the likely appeals by either party in this relatively new area of determining the parameters of the legal obligations of welfare agencies such as DSS to persons with dental access barriers, would entail significant delay in systemic improvements to DSS services. This delay could obviously be years.

As a result of the discovery process and subsequent settlement negotiations, it became clear the parties had a mutual interest in improving DSS policies and procedures regarding dental access. The negotiations were informed by the discovery and legal and scientific research conducted by counsel and their experts, over the course of the eight years this case has been pending. The assistance of experts additionally proved invaluable in evaluating and crafting appropriate remedial steps, including the development of a new dental fee reimbursement schedule with significant rate increases, which ultimately led to the Settlement Agreement before the Court. Both parties participated in crafting the resolution reflected in the agreement. The defendant was able to cost out state budgetary expense estimates related to improvements in the dental fee schedule, which were shared with plaintiffs.

### 4. The ability of the defendants to withstand a greater judgment

Connecticut adopts a biennial budget in each odd-numbered year, with adjustments made in even-numbered years. Conn. Gen. Stat. § 4-71. While the state may well be able to afford increased costs resulting from a trial and judgment, it is unnecessary in this case where the parties have reached an

24

informed settlement. This settlement, addressing the claims of the plaintiff class and subclass, has predictable expenses that will facilitate state budget planning.

## IV. The Parties Request Court Approval of the Proposed Class Notice and Method of Distribution.

The parties have jointly proposed a form of class notice, in English and Spanish, which includes two versions: (1) a large-print, one-page "short-form" summary of the Settlement Agreement, followed by (2) a more detailed, "long-form" summary of the settlement terms. The notices are attached as Exhibit "B" to the accompanying Joint Motion for Preliminary Approval of Proposed Settlement Agreement and Class Action Notice. The short-form and long-form versions of the notice each identify the date, time and location of the Rule 23(e)(2) fairness hearing before the Court. The short-form notice references the following information, which is summarized in more detail in the long-form notice: the nature of the action; the definition of the certified plaintiff class and subclass; the terms and binding nature of the Settlement Agreement; contact information for plaintiffs' counsel to obtain additional information regarding the litigation; information on how to make written objections, if any, to the Settlement Agreement; and information regarding obtaining a complete copy of the Settlement Agreement, if desired.

The parties also propose the issuance of notice to plaintiff class and subclass members through the posting of bilingual posters of at least 11" by 17," to be prominently displayed in the waiting rooms of all DSS offices, with copies of the long-form notice in English and Spanish to be made publicly available, either next to the poster or nearby. A copy of the English-language poster is attached as Exhibit "C" to the

accompanying Joint Motion for Preliminary Approval of Proposed Settlement Agreement and Class Action Notice. Additionally, both the short-form and long form notices, in English and in Spanish, as well as the Settlement Agreement, will be prominently posted on the DSS website.

The parties propose that individually mailed notice of both the short-form and long-form versions be sent by DSS to current, identified DSS Medicaid HUSKY A program applicants and recipients. The parties propose determining pending Medicaid HUSKY A applicants by those applicants entered in the DSS computer system at the time DSS extracts the list of notice recipients from such system, approximately two weeks prior to completion of notice mailing. They also propose provision of notice in Spanish to all persons identified in the computer system as preferring Spanish; all others will be provided with the English version of the notice.

The parties believe the proposed notice will reasonably reach the members of the certified plaintiff class and subclass. It will also fairly apprise them of the Settlement Agreement terms, and allow them to participate in the final fairness hearing, should they choose to do so. Therefore, the parties ask that the Court approve the proposed form and manner of notice, and its method of distribution.

## V. Conclusion

The parties believe resolution of this matter through negotiation, rather than further lengthy and expensive adversarial litigation, is in the best interests of both defendant and the plaintiff class and subclass. The Settlement Agreement includes terms and conditions that are fair, reasonable and adequate, addressing the issues raised on behalf of the plaintiff class and subclass. It will result in effective, systemic

improvements more quickly than if the lawsuit was fully litigated, and without the attendant expense and uncertainty.

For the reasons articulated above, the parties request that the Court enter an order, in advance of a hearing conducted pursuant to Fed. R. Civ. P. 23(e)(2), preliminarily approving the Settlement Agreement, and approving the proposed form of class notice, as well as the proposed manner of delivery of the class notice.   Finally, the parties request that the Court enter an order scheduling a date and time for a fairness hearing to consider final approval of the parties' proposed settlement.

Respectfully submitted:

Plaintiffs, by Undersigned, Authorized
Counsel of Record:


Greg Bass
Federal Bar No. CT18114
Greater Hartford Legal Aid
999 Asylum Avenue, 3rd Floor
Hartford, CT 06105
(Tel.) 860.541.5018
(Fax) 860.541.5050
gbass@ghla.org

Michael Starkowski, Commissioner,
Department of Social Services, by
Undersigned, Authorized Counsel of
Record:


Hugh Barber, Assistant Attorney General
Federal Bar No. CT05731
Office of the Attorney General
55 Elm St., P.O. Box 120
Hartford, CT 06141
(Tel.) 860.808.5210
(Fax) 860.808.5385
hugh.barber@po.state.ct.us


James Bell
Federal Bar No. CT15520
Greater Hartford Legal Aid
999 Asylum Avenue, 3rd Floor
Hartford, CT 06105
(Tel.) 860.541.5046
(Fax) 860.541.5050
jbell@ghla.org

*Anne Louise Blanchard* JB

Anne Louise Blanchard
Federal Bar No. CT08718
Connecticut Legal Services
872 Main St.
P.O. Box 258
Willimantic, CT 06226
(Tel.) 860.456.1761
(Fax) 860.456.7420
ablanchard@connlegalservices.org


*Kristen Noelle Hatcher* JB

Kristen Noelle Hatcher
Federal Bar No. CT27002
Connecticut Legal Services
587 Main St.
New Britain, CT 06051
(Tel.) 860.225.8678
(Fax) 860.225.6105
khatcher@connlegalservices.org

Dated:     5/1/08